2004-NMSC-035

103 P.3d 554

**JICARILLA APACHE NATION,**
Plaintiff–Respondent,

v.

**Arthur RODARTE, in his official capacity only, Rio Arriba County Assessor, Defendant–Petitioner.**

No. 28,128.

Supreme Court of New Mexico.

Sept. 3, 2004.

phen H. Greetham, Albuquerque, NM, for Respondent.

Javier R. Lopez, Santa Fe, NM, for Amicus Curiae New Mexico Taxation & Revenue Department.

Canepa & Vidal, P.A., Rae Ann Shanley, Timothy J. Vidal, Santa Fe, NM, for Amicus Curiae Rancho Del Oso Pardo, Inc.

## OPINION

CHÁVEZ, Justice.

{1} Petitioner Arthur Rodarte, the Rio Arriba County Assessor acting in his official capacity only, appeals from a decision of the Court of Appeals which reversed the decision of the Rio Arriba County Valuation Protests Board (the Board). The Board had upheld Petitioner's property tax assessment which changed the classification of the bulk of the 32,075.80–acre property at the Lodge at Chama (the Lodge) from agricultural to "miscellaneous non-residential." The change resulted in a nearly ten-fold increase in the Lodge's assessed value, from $2,199,378 to $21,301,191. At issue is whether Petitioner and the Board properly concluded: (1) that neither the Lodge's private elk herd nor the public herd is "livestock" under the property tax code for purposes of determining whether the property in question is agricultural, and (2) that the Lodge's conservation agreement with the federal government was either not a proper soil-conservation agreement to qualify as an agricultural use or not the primary use of their land. Finding that the Board properly relied on a reasonable determination of the Property Tax Division of the Department of Taxation and Revenue (the Division), we reverse the Court of Appeals and uphold the Board's decision.

### I. Background

{2} The 32,075.80–acre Lodge is located near Chama, New Mexico, and until 1989 or 1990 was known as the "Chama Land and Cattle Company." The Lodge bills itself as "one of the world's foremost outdoor recreational retreats." Respondent Jicarilla Apache Nation purchased the Lodge in 1995. From at least 1996 through 1999, the proper-

Ted J. Trujillo, Espanola, NM, for Petitioner.

Nordhaus, Haltom, Taylor, Taradash & Bladh, L.L.P., Daniel I.S.J. Rey–Bear, Ste-

ty was classified as agricultural, and Respondent paid ad valorem taxes on its private elk herd. In 2000, however, assessors at Petitioner's office received information that led them to conclude that the Lodge was used for recreational, rather than agricultural, purposes. Specifically, they received a copy of a letter from the Bureau of Indian Affairs (BIA) to the Jicarilla Apache Nation that seemed to indicate the Lodge was used primarily as a recreational retreat, which was confirmed by looking at the Lodge's website. Additionally, the assessors learned from attending a seminar on the subject that the Department of Taxation did not consider elk to be livestock under the Property Tax Code. In fact, the assessors and the Board relied on Property Tax Division (P.T.D.) General Order No. 99–25, issued by the Division. In that order, as required by NMSA 1978, § 7–36–21(D) (1975), the Division determined the "various classes of livestock and the value of each class." The order does not list "elk" among the various classes of livestock. As a result, Petitioner issued an amended notice of valuation that reclassified the land from agricultural to miscellaneous non-residential. Respondent protested to the Board, which conducted a hearing on the claim.

{3} Before the hearing, the parties resolved a number of the potential issues facing the Board by stipulation. The parties agreed to the classification and valuation of the fifteen-acre homesite: the four acres underlying the residential structures and lodge structure are valued at $10,000 per acre, and the remaining eleven acres are valued at $664 per acre. Additionally, the parties stipulated that twenty acres of the property are classified as irrigated land and valued at $150 per acre, and five-thousand acres on the western portion of the property are classified as grazing land and valued at $2.00 an acre. Finally, the parties stipulated that "[t]he only issue in controversy in this action is whether the remaining 27,040.80 acres at the Property should be classified and valued as agricultural land."

{4} At the hearing, it was established that the 27,040.80 acres covers two types of land. First, the Lodge operates two 3,200–acre state-licensed game parks on which it maintains its private elk herd. These game preserves are each enclosed by an eight-foot-high fence. Respondent actively manages the private elk herd through a heavily regulated genetic improvement breeding program and irrigates the land to produce feed. The Lodge maintains an elk handling facility which allows year-round handling of up to 200 elk at a time for testing, tagging and other measurements, and feeds some of the elk from troughs. Second, the Lodge maintains the remaining land, the "uplands," as a habitat for the wild public herd of elk that graze there.

{5} The uplands portion of the property is maintained consistent with a conservation plan entered into with the United States Department of Agriculture (the USDA) as part of its Environmental Quality Incentives Program (EQIP). The Lodge's stated purpose for entering into the agreement was to improve the elk habitat in order to improve "the production, quality, and health of wild elk there." Under the agreement, the Lodge agreed to construct fences; to irrigate to minimize soil erosion and nutrient losses; to manage grazing to protect the soil resources; and to manage pasture and hayland to maintain enough soil cover. In return, the USDA agreed to share some of the costs. Respondent also manages its timber resources in the uplands in order to maximize the elk habitat.

{6} The Lodge maintains the private elk herds on the game parks so that it can sell big game hunting packages. These packages include food, lodging, and guide services, and can cost up to $13,000 per person. The Lodge also sells permits, which it has received from the state, for its customers to hunt the wild elk in the uplands area. Because the quality of the private herd of elk is better than that of the wild herd, the permits to hunt from the public herd are less expensive. Nearly all of the hunters who have this package take home the packaged meat from the animal and have the carcasses mounted. The Lodge also sold some of the elk to another farm in 1999, but most elk are "harvested" through these paid hunting packages.

{7} On these facts, the Board found that "the use of that property is primarily as a habitat for elk, [and] that all other uses,

including arguably agricultural uses, are secondary and incidental to that primary use." Because the Board agreed with the Petitioner that the Division does not consider elk to be livestock for purposes of the agricultural exemption of the Property Tax Code, it concluded that the primary use of the land is not agricultural. With respect to the soil conservation agreement, the Board found that it "has, as its primary purpose, the development and maintenance of a habitat suitable for the maintenance of elk, not soil conservation." Indeed, the Board found that "[a]ny soil conservation effected by the plan is incidental and secondary to this primary purpose. As such, the plan does not qualify as a soil conservation program pursuant to [the Property Tax Code]."

{8} Respondent filed an appeal to the district court, which certified the case to the Court of Appeals as one involving a substantial public interest. *See* NMSA 1978, § 39-3-1.1(F) (1999). The Court of Appeals accepted certification and reversed the decision of the Board. In so doing, the Court of Appeals held that the private herd of livestock fits the statutory definition of "other domestic animals useful to man," NMSA 1978, § 7-35-2(C) (1994), but that the public herd in the uplands region did not. *Jicarilla Apache Nation v. Rio Arriba County Assessor*, 2004-NMCA-055, ¶¶ 28, 35, 135 N.M. 630, 92 P.3d 642. The Court of Appeals also held that the agreement between the Lodge and the USDA represented a valid soil conservation agreement, and that under the Department of Taxation and Revenue's own regulations, the mere existence of such an agreement is sufficient to establish that the primary use of the land it covers is agricultural. *Id.* ¶¶ 38-39. We reverse both of these holdings of the Court of Appeals.

## II. Discussion

{9} Under the Property Tax Code, property is typically valued as "its market value as determined by application of the sales of comparable property, income or cost methods of valuation or any combination of these methods." NMSA 1978, § 7-36-15(B) (1995). The Legislature has, however, provided for a different valuation method for "land used primarily for agricultural purposes," which is instead "the land's capacity to produce agricultural products." NMSA 1978, § 7-36-20(A) (1997). Typically, as it did in this case, this method of valuation results in a much lower tax burden. We have previously identified the policy underlying this agricultural exemption: "It is clear that the legislative intent behind this special method of property tax valuation is to aid the small subsistence farmers in our state." *County of Bernalillo v. Ambell*, 94 N.M. 395, 397, 611 P.2d 218, 220 (1980). Although we are not certain that the size of the operation that puts land to agricultural use is significant, it is certain that the exception is designed to promote bona fide agriculture in New Mexico. In determining whether a particular property is being put to an agricultural use, we must bear in mind this policy and the fact that it is an exception to the general method of valuation.

{10} Under the same statute, "agricultural use" is defined as "the use of land for the production of plants, crops, trees, forest products, orchard crops, livestock, poultry or fish." Section 7-36-20(B). Livestock, the only term in that list relevant to this case, is in turn defined for purposes of the Property Tax Code as "cattle, buffalo, horses, mules, sheep, goats, swine, ratites and other domestic animals useful to man." Section 7-35-2(C). Section 7-36-20(B) further provides that agricultural use "also includes the use of land that meets the requirements for payment or other compensation pursuant to a soil conservation program under an agreement with an agency of the federal government."

{11} The Court of Appeals had previously discerned from Section 7-36-20 three separate requirements for qualifying for the agricultural exemption: (1) the property must be put to agricultural use; (2) that use must be bona fide; and (3) that use must be the primary use of the property. *Alexander v. Anderson*, 1999-NMCA-021, ¶ 11, 126 N.M. 632, 973 P.2d 884. As noted, the Court of Appeals in this case reversed the Board on two salient points. First, the Court of Appeals held, contrary to the Board, that raising the private elk herd did constitute "agri-

cultural use." Second, the Court of Appeals held that the Lodge's conservation agreement was sufficient to establish that the "primary use" of the land was agricultural. After resolving some initial issues involving conflicting statutory presumptions and the use of an income method of valuation, we turn to each of these major holdings.

### A. Statutory presumptions

■ {12} Under Section 7–36–20(A), as amended in 1997, if property has been classified as agricultural in one of the three previous years and the use of the land has not changed, there is a presumption that the property continues to be agricultural. On the other hand, under NMSA 1978, § 7–38–6 (1981), Petitioner enjoys a statutory presumption that his valuation and classification is correct. The Board tried to reconcile these two provisions by concluding that Petitioner had the initial burden to show that the classification had changed or the original classification was incorrect. If at the end of his case-in-chief he had met that burden by showing that the use had changed or that the original classification was in error, he then enjoyed the statutory presumption of correctness and the Lodge then had the burden to show his valuation to be incorrect. *Cf.* NMSA 1978, § 7–36–16(A) (2000) (requiring assessors to "implement a program of updating property values so that current *and correct* values of property are maintained") (emphasis added). The Court of Appeals rejected this approach, relying on *Black v. Bernalillo County Valuation Protests Board,* 95 N.M. 136, 619 P.2d 581 (Ct.App.1980). In that case, the Court of Appeals held that Section 7–38–6 did not apply to the initial question whether property was entitled to the special valuation method available to agricultural property. *Black,* 95 N.M. at 141, 619 P.2d at 586.

{13} Subsequent to *Black,* however, the Legislature amended Section 7–38–6. Prior to the 1981 amendment, Section 7–38–6 read, in its entirety:

Values of property for property taxation purposes determined by the department or the county assessor are presumed to be correct. Determinations of tax rates, allo-cations of net taxable values of property to governmental units and the computation and determination of property taxes made by the officer or agency responsible therefor under the Property Tax Code [Articles 35 to 38 of Chapter 7 NMSA 1978] are presumed to be correct.

1973 N.M. Laws ch. 258, § 46. Only the first sentence was quoted in *Black.*

{14} Subsequently, the Legislature amended Section 7–38–6 to read:

Values of property for property taxation purposes determined by the division or the county assessor are presumed to be correct. Determinations of tax rates, *classification,* allocations of net taxable values of property to governmental units and the computation and determination of property taxes made by the officer or agency responsible therefor under the Property Tax Code [Articles 35 to 38 of Chapter 7 NMSA 1978] are presumed to be correct.

1981 N.M. Laws ch. 37, § 67 (emphasis added). The only major substantive difference between these two sections is the addition of the word "classification" in the second sentence. The question whether property is entitled to the special valuation method in Section 7–36–20 is a question of classification: property that is classified as agricultural is entitled to the benefit of that section, whereas other property is not. For that reason, we hold that the Legislature statutorily overruled *Black* to the extent it held that the Assessor and Board are not entitled to the statutory presumption of correctness under Section 7–38–6.

■ {15} Furthermore, we conclude that the Board properly reconciled the competing presumptions found in Sections 7–36–20 and 7–38–6. Although the Legislature amended Section 7–36–20 in 1997, subsequent to the 1981 amendment to Section 7–38–6, it chose not to modify the statutory presumption in that later Section. We presume that the Legislature acts with full knowledge of, and consistent with, existing legislation. *State ex rel. Quintana v. Schnedar,* 115 N.M. 573, 575–76, 855 P.2d 562, 564–65 (1993). "Thus, two statutes covering the same subject matter should be harmonized and construed together when possible, ... in

a way that facilitates their operation and the achievement of their goals." *Id.* We therefore try to read Section 7–36–20 and 7–38–6 harmoniously, in a way that can give effect to the presumptions established by each. The Board's burden-shifting approach is a reasonable attempt to reconcile these two provisions, and we uphold it. We therefore reverse the Court of Appeals on this point and accept the Board's decision to afford Petitioner a presumption that his classification of the property in question as "miscellaneous non-agricultural" was correct, having met his initial burden of putting on a prima facie case that the original classification was incorrect.

## B. Income analysis

{16} In concluding that the property in question was not put to agricultural use, the Board relied in part on one of the Assessor's exhibits which contrasted the income the Lodge earned from elk hunting, big game parks, sport fishing, skeet-shooting, hiking, cross-country skiing, the restaurant, the lodge, and the corporation facilities, which the Assessor concluded were non-agricultural uses of the land, with the income earned from timber production and cattle grazing, which the Assessor conceded were agricultural. The exhibit showed that over eighty percent of the Lodge's income came from non-agricultural sources.

{17} As authority for this income method of classification, the Board noted that Section 7–36–15 provided for such a method. Section 7–36–15(B), however, allows for such a method of valuation "[u]nless a method or methods of valuation are authorized in Sections 7–36–20 through 7–36–33." As noted, Section 7–36–20 provides the method of valuation for agricultural property. Faced with these provisions, the Board concluded that the methods of Section 7–36–20 "are not the exclusive methods by which the classification and valuation of the subject property can occur," and found support for that interpretation in the Department of Taxation's regulations, including 3.6.5.22 NMAC and 3.6.5.27(A)(2) NMAC. The latter regulation provides that "[a] presumption exists that land is not used primarily for agricultural purposes if income from nonagricultural use of the land exceeds the income from agricultural use of the land." 3.6.5.27(A)(2) NMAC.

{18} The Court of Appeals rejected this approach, noting first that to the extent the Board relied on Section 7–36–15, that section does not, by its plain terms, apply to agricultural property. Furthermore, the Court of Appeals argued that valuation is distinct from classification and "[i]t makes no sense to classify property in the first instance by looking to its income potential or value, a step that should not take place until the property has first been classified." *Jicarilla Apache Nation,* 2004–NMCA–055, ¶ 22, 135 N.M. 630, 92 P.3d 642,. Finally, the Court of Appeals reasoned that the Board expressly did not rely on 3.6.5.27(A)(2) NMAC, "other than as indirect support for their reliance on Section 7–36–15." *Jicarilla Apache Nation,* 2004–NMCA–055, ¶ 23, 135 N.M. 630, 92 P.3d 642. Noting that it had previously questioned the validity of this regulation creating such a factual presumption in *Black,* the Court of Appeals chose not to address reliance on the regulation because it concluded that the Board itself did not rely on the regulation.

{19} Contrary to the Court of Appeals, we conclude that the Board did, in fact, rely on 3.6.5.27(A)(2) NMAC to support the use of an income analysis. As noted, the Board expressly concluded that the methods of valuation and classification found in Section 7–36–20 are not the only permissible methods, and it found support for that conclusion in two Department of Taxation regulations, one of which was 3.6.5.27(A)(2) NMAC. Its reasoning could have been clearer, and in general we evaluate an administrative agency's decision solely on the grounds that it itself used, but we may affirm an agency decision whose analysis is less than ideal. *See Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n,* 2003–NMSC–005, ¶ 13, 133 N.M. 97, 61 P.3d 806. Furthermore, the use of such an income analysis is reasonable. When the subject property is used in multiple ways, some agricultural and some not, using a comparison of the income derived from each type of use is in this case a reasonable proxy for determining whether the agricultural use is primary. The fact

that the regulation creates a presumption, rather than an inflexible conclusion, tends to make the regulation more, not less, reasonable. We thus do not share the same concerns as the Court of Appeals about the Department of Taxation creating a factual presumption of this kind by regulation. *See Black*, 95 N.M. at 141, 619 P.2d at 586.

{20} Of course, as the Court of Appeals noted, when the parties dispute whether a given use is agricultural, this analysis is of limited utility. That is, it does not help determine whether a given use is agricultural, but only whether, in the case of multiple uses, the agricultural use or uses are primary. Further, the regulation only provides for a rebuttable presumption that uses which generate a higher income are primary. There may be circumstances in which that presumption can be rebutted. For example, in *Alexander* the Court of Appeals noted that taxpayers must come forward with "evidence of intent to produce a crop." 1999–NMCA–021, ¶ 27, 126 N.M. 632, 973 P.2d 884. Furthermore, the Court of Appeals in that case did not "read the subject provisions as requiring proof of actual sales. All that is required is an *objective intent to produce a crop* for sale or home consumption." *Id.* ¶ 28 (emphasis added). Thus, there may be circumstances in which, due to crop failure or unforeseen market conditions, a taxpayer may generate more income in some years from non-agricultural uses of the land than agricultural ones. Because *Alexander* only required proof of "objective intent to produce a crop," and not "proof of actual sales," a landowner with that intent could rebut the presumption. That is but one example; there may be other ways a taxpayer could rebut the presumption and establish that an agricultural use which generates less income than non-agricultural ones is, nevertheless, the primary use of the land.

{21} In this case, the income analysis found in the regulation does not resolve the issues presented on appeal. That is, it does not answer the question whether or not raising elk in two 3,200–acre enclosed game preserves for the primary purpose of producing trophy bulls for hunters is agricultural. It does, however, support the Board's determination that, assuming that such a use is not agricultural, the Lodge should not enjoy the agricultural method of valuation because the income derived from the non-agricultural uses significantly exceeds that of the admittedly agricultural uses of timber production and cattle grazing. Thus, while we uphold the Board's reliance on 3.6.5.27(A)(2) NMAC generally, we do not rely on the regulation in resolving the remaining issues.

## C. Elk as livestock

■ {22} Because elk are not included among the enumerated animals in the definition of livestock under Section 7–35–2(C), the question becomes whether either the Lodge's private or public herd of elk are "other domestic animals useful to man." Under the Property Tax Code, Petitioner and the Board are entrusted to make this initial determination, subject to the Division's supervision. *See* NMSA 1978 § 7–36–16(A) (2000) ("County assessors shall determine values of property for property taxation purposes in accordance with the Property Tax Code ... and the regulations, orders, rulings and instructions of the department."); NMSA 1978 § 7–35–3(A) (1989) ("The director [of the Division] has general supervisory authority over county assessors for the purposes of assuring implementation of and compliance with the provisions of the Property Tax Code ... and applicable regulations, orders, rulings and instructions of the department."). In this case both Petitioner and the Board based their decision on the fact that Petitioner learned from attending a seminar that the Division does not consider elk to be livestock and had omitted elk from its list of classes of livestock in P.T.D. Order No. 99–25. That order is required by NMSA 1978, § 7–36–21(D) (1975), and directs the assessors in the imposition of property taxes on livestock. Furthermore, the Department of Taxation's regulations provide:

> Classes of livestock and the value of each class are required to be established by order each tax year pursuant to [Section 7–36–21]. Particular classes or types of "[other] domestic animals useful to man" which are named in the order establishing classes of livestock are "livestock" as that term is defined in [Section 7–35–2].

3.6.1.7(F) NMAC. The assessors are required to follow this order in valuing livestock for property tax purposes. *See* Section 7–36–16(A); *see also Zwaagstra v. DelCurto,* 114 N.M. 263, 264–65, 837 P.2d 457, 458–59 (Ct. App.1992) (concluding that the assessors do the actual valuation of livestock, although their discretion is limited to "determin[ing] the number of animals in each class of livestock owned by the taxpayer, and apply[ing] to that the values established by the division"). Thus, although procedurally we are reviewing the Board's decision to uphold Petitioner's assessment, in a very real sense we are reviewing the Division's determination that elk are not livestock and its decision not to include elk in P.T.D. Order No. 99–25.

### 1. Standard of Review

{23} The Court of Appeals concluded that the Lodge's private elk herd fit the definition of livestock contained in Section 7–35–2(C), but that the public herd did not. The answer to this question depends, in large part, on the appropriate standard of review. Under NMSA 1978, § 7–38–28 (1999), a party may appeal an order made by a county valuation protests board by filing an appeal pursuant to the provisions of NMSA 1978, § 39–3–1.1 (1999). Under Subsection D of Section 39–3–1.1, there are three grounds for reversing an order of an agency:

(1) the agency acted fraudulently, arbitrarily or capriciously;

(2) the final decision was not supported by substantial evidence; or

(3) the agency did not act in accordance with law.

The Court of Appeals acknowledged this limited scope of review but also noted that, while it would not substitute its judgment for that of the Board's, it was not bound by the Board's interpretation of the law. *Jicarilla Apache Nation,* 2004–NMCA–055, ¶ 17, 135 N.M. 630, 92 P.3d 642. Although it never makes this point explicit, the Court of Appeals seemed to view this question to be a legal one and reviewed the Board's determination de novo.

{24} Determining whether the Lodge's private or public herd of elk consists of "other domestic animals useful to man" would ordinarily require factual findings about the nature of the elk and the Lodge's handling of them, and then a legal determination whether the facts so found support the conclusion that the elk fit the legal definition of livestock. In general, we review findings of fact for substantial evidence, and the legal conclusion de novo. *See TPL, Inc. v. N.M. Tax. & Rev. Dep't,* 2003–NMSC–007, ¶ 10, 133 N.M. 447, 64 P.3d 474; *Rauscher, Pierce, Refsnes, Inc. v. Tax. & Rev. Dep't,* 2002–NMSC–013, ¶ 26, 132 N.M. 226, 46 P.3d 687. *But see State v. Attaway,* 117 N.M. 141, 144–45, 870 P.2d 103, 106–07 (1994) (suggesting that the standards of review for fact and law are not binary and the degree of deference given to a mixed question of law depends less on the category into which each fall than on "principles of appellate review" and "policy considerations"). Here, however, the facts are not in dispute. Instead, the parties disagree about the legal conclusion to draw from those facts. Thus, we are faced with a pure question of law, which we review de novo. *See TPL, Inc.,* 2003–NMSC–007, ¶ 10, 133 N.M. 447, 64 P.3d 474.

{25} Although we review de novo the Board's legal conclusion that elk are not livestock under the Property Tax Code, that de novo review is limited by the deference courts should give to these kinds of legal determinations made by administrative agencies. As we noted in *Rio Grande Chapter of the Sierra Club,* 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806, we are not bound by an agency's interpretation of the law, but we do give deference to an agency's reasonable interpretation or application of law. *See also Chavez v. Mountain States Constructors,* 1996–NMSC–070, ¶¶ 20–21, 122 N.M. 579, 929 P.2d 971; *Morningstar Water Users v. New Mexico Pub. Util. Comm'n,* 120 N.M. 579, 583, 904 P.2d 28, 32 (1995). Indeed, we give a "heightened degree of deference to legal questions that 'implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function.'" *Morningstar Water Users,* 120 N.M. at 583, 904 P.2d at 32 (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987)). Given that deferential standard of

review, we cannot conclude that the Board acted improperly in following the direction of the Division and concluding that elk are not livestock for purposes of the Property Tax Code.

## 2. The Merits

{26} In affirming Petitioner's assessment, the Board relied, in part, on the fact that P.T.D. Order No. 99–25 does not include elk in its list of livestock. The Court of Appeals rejected this approach, noting that the Order also fails to include other animals, such as buffalo, mules, and ratites, that are specifically listed as livestock in Section 7–35–2. Thus, the Court of Appeals concluded, "the absence of an animal from the Order cannot be deemed conclusive or even to provide guidance in the interpretation of Section 7–35–2." *Jicarilla Apache Nation*, 2004–NMCA–055, ¶ 29, 135 N.M. 630, 92 P.3d 642. Petitioner, however, was not using P.T.D. Order No. 99–25 as an aid in interpreting the statute, but rather as evidence of the Division's determination on the issue, which determination he must follow. *See* Section 7–36–16(A). Furthermore, it was not the only evidence of the Division's determination; as noted, an assessor in Petitioner's office testified that he learned that the Division did not consider elk livestock from attending a seminar on the subject. *See* NMSA 1978, § 7–35–5(A) (1991) ("The department shall conduct or sponsor special courses of instruction and in-service and intern training programs on the technical, legal and administrative aspects of property taxation."). The fact that some animals listed in the statute are absent from the order could become an issue in other cases, but it is not at issue here. That is, had Petitioner denied an agricultural exemption to land used primarily to produce buffalo based solely on its absence in the order, such a decision would be invalid because it violates Section 7–35–2. Because, however, Petitioner denied an agricultural exemption to land used primarily to produce an animal that is included in neither the

order nor the statute, and because the order is not the only evidence of the Division's conclusion on the matter, we cannot say Petitioner unreasonably concluded that the Division does not consider elk to be livestock.

{27} On appeal to this Court, the Department of Taxation and Revenue filed an Amicus Curiae brief arguing that the Court of Appeals' opinion, by allowing the assessors to disregard the direction of the Division, could lead to uneven application of the Property Tax Code. Indeed, the Department could not "emphasize too strongly what problems it would cause in the administration of property taxes throughout the state if local county assessors had the power to substitute their own judgment for statutory provisions and regulations and classifications issued by the Department." [**Amicus Br. 6**] That risk is heightened by the final result of the Court of Appeals' opinion, which concluded that some elk are livestock and other elk are not.[1] We agree that uneven administration of the Property Tax Code is troubling, which is why we emphasize that what we are reviewing in this case is the Division's categorical determination that elk are not livestock. As we explain below, we conclude that the Division's conclusion that elk are not livestock is a reasonable interpretation of Section 7–35–2. Furthermore, the facts of this case show that the Petitioner's and the Board's acceptance of the Division's determination is also reasonable.

{28} Neither party disputes that the meat and hides of elk make them "useful to man." Rather, the dispute centers on the question whether elk are "domestic animals." The Court of Appeals reversed the Board in part because it concluded that elk are not significantly less tame than buffalo. *Jicarilla Apache Nation*, 2004–NMCA–055, ¶ 28, 135 N.M. 630, 92 P.3d 642. In support of this argument, the Court noted how the Lodge carefully regulates their breeding and they are kept within an eight-foot fence. Although these facts are both indicia of domes-

---

1. We note that this conclusion undercuts in part the Court of Appeals' rationale for accepting certification: because the uniform application of the Property Tax Code is a matter of substantial public interest, the trial court properly certified the case to them, which they were then statutorily obligated to accept. *See Jicarilla Apache Nation*, 2004–NMCA–055, ¶ 13, 135 N.M. 630, 92 P.3d 642.

tication, we conclude that they are not sufficient to allow a court to second-guess the Board's decision to follow the Division's determination. Although the private elk herd are contained within a fence, that fence encloses two separate 3,200–acre game preserves. There was no testimony at the hearing to support a conclusion that the herd was significantly restricted within either of the 3,200–acre sections. Furthermore, the Board based its conclusion in part on the fact that the elk were used to support the Lodge's use as a hunting lodge. The fact that the elk are "harvested" through big game hunts—that is, through sport—is at odds with a conclusion that they are "domestic," and supports the Board's decision to follow the determination of the Division. They are distinguished from the animals in the enumerated list of livestock in Section 7–35–2(C) by this fact.

{29} Finally, contrary to the Court of Appeals, we do not conclude that the fact that "farmed cervidae" is listed under the definition of livestock under the Livestock Code is dispositive of their classification under the Property Tax Code. First, we note that each definition includes different animals in its enumerated lists that fit the definition. *Compare* NMSA 1978, § 77–2–1.1(A) (2001) (livestock includes "horses, asses, mules, cattle, sheep, goats, swine, bison, poultry, ostriches, emus, rheas, camelids and farmed cervidae"), *with* § 7–35–2(C) (livestock means "cattle, buffalo, horses, mules, sheep, goats, swine, [and] ratites"). Additionally, each provides a different blanket definition covering those animals not listed. *Compare* § 77–2–1.1(A) (" 'livestock' means all domestic or domesticated animals that are used or raised on a farm or ranch, including the carcasses thereof, and exotic animals in captivity"), *with* § 7–35–2(C) (livestock also means "other domestic animals useful to man"). Had the Legislature intended for the word "livestock" to be given identical treatment under each section, it would have been

a simple matter for it to have given the term identical definitions.[2]

{30} Second, the definition section of the Livestock Code begins: "As used in The Livestock Code ...:" Section 77–2–1.1. The Property Tax Code definition section is preceded by a similar phrase. *See* § 7–35–2. Thus, both codes, by their express terms, limit the scope of the definitions contained therein. Additionally, the definition of "livestock" under the Livestock Code itself recognizes different definitions of the term for different purposes. The general definition described above is followed by these provisos:

> [P]rovided that for the purposes of Chapter 77, Article 9 NMSA 1978, [dealing with branding of livestock] "animals" or "livestock" have the meaning defined in that article.... For the purpose of the rules governing meat inspection, wild animals, poultry and birds used for human consumption shall also be included within the meaning of "animals" or "livestock[.]"

Section 77–2–1.1(A). Chapter 77, Article 9, referred to above, defines "livestock" only as "horses, asses, mules, cattle or bison." NMSA 1978, § 77–9–1.1 (1999). Thus, even the Livestock Code itself recognizes that the definition of livestock is not fixed and can have different meanings in different contexts.

{31} Finally, we note that other Codes seem to refer to elk in a way that is inconsistent with their being livestock. For example, the Food Donors Liability Act contains a provision allowing hunters to donate wild game meat products. That provision defines "wild game" as "deer, *elk*, antelope, caribou, ibex, oryx and Barbary sheep." NMSA 1978, § 41–10–5(B) (1997) (emphasis added). Additionally, NMSA 1978, § 17–2–3(A)(4) (1971), contained in the Chapter that describes the duties and powers of the State Game Commission to regulate the hunting of certain animals, includes "all of the family

**2.** For example, in a completely different context, the Legislature has identified two stages of a criminal trial where a defendant's mental retardation is relevant: (1) competency to stand trial and (2) sentencing in capital trials. In the two separate statutory provisions addressing these procedures, the definition of mental retardation is identical. *Compare* NMSA 1978, § 31–20A–2.1(A) (1991) (defining "mental retardation" in the context of a bar to execution), *with* NMSA 1978, § 31–9–1.6(E) (1999) (defining "mental retardation" which can result in incompetency to stand trial).

Cervidae (elk and deer)" in the list of "game mammals" subject to the commission's regulation.

{32} As the Court of Appeals held, in general we try to read different statutes "in connection with other statutes concerning the same subject matter." *Quantum Corp. v. Taxation & Revenue Dep't,* 1998–NMCA–050, ¶ 8, 125 N.M. 49, 956 P.2d 848. Additionally, we generally presume that the Legislature does not intend to enact legislation inconsistent with existing law. *See Schnedar,* 115 N.M. at 575, 855 P.2d at 564. We, however, see nothing necessarily inconsistent with defining terms in different ways depending on the context in which the term is to be used. The Legislature, for whatever reason, has defined livestock and elk differently in different sections. We must give effect to that unambiguous intent.

{33} The Court of Appeals concluded that the private elk herd could only be considered livestock. We reverse that conclusion and hold that the Board properly deferred to the decision of the Division that the private herd was not livestock, despite the fact that it bears some indicia of domestication. The Court of Appeals also held that the public herd was not livestock. Because the public herd bears none of the indicia of domestication, we affirm that conclusion. We do so because the facts of this case allow us to accept the Division's categorical determination that elk are not livestock. As the Court of Appeals noted, however, these conclusions do not completely resolve the case. We next determine whether the Lodge's conservation agreement with the USDA mandates that the property in question be considered agricultural.

### D. Soil conservation program

{34} Although Petitioner had conceded at the hearing that the Lodge's conservation agreement with the USDA was a bona fide agricultural use, the Board concluded that it was not. Specifically, the Board concluded that the agreement

has, as its primary purpose, the development and maintenance of a habitat suitable for the maintenance of elk, not soil conservation. Any soil conservation effected by the plan is incidental and secondary to this primary purpose. As such, the plan does not qualify as a soil conservation program pursuant to [Section 7–36–20(B)].

The Court of Appeals reversed, concluding that: (1) the agreement was a soil conservation agreement under Section 7–36–20(B); and (2) under the Department of Taxation's regulations, a valid soil conservation agreement is by itself sufficient to show that the property is primarily used for agricultural purposes. *Jicarilla Apache Nation,* 2004–NMCA–055, ¶¶ 38, 40, 135 N.M. 630, 92 P.3d 642.

{35} The Board's conclusion is ambiguous. On the one hand, language in the first part of the paragraph quoted above suggests that it rejected the Lodge's argument because it concluded that the conservation agreement was not the *primary use of the land.* On the other hand, the last sentence states that, because soil conservation was not the *primary purpose of the agreement,* it did not qualify as a soil conservation agreement under the statute.

{36} To the extent that the Board concluded that the agreement was not a soil conservation agreement, we agree with the Court of Appeals that such a conclusion would be error. This agreement is with the USDA, an "agency of the federal government" under Section 7–36–20(B). It required the Lodge to irrigate "for the purpose of ... minimiz[ing] soil erosion and nutrient losses"; to manage grazing on a schedule that "meets the needs of the soil, water, air, plant and animal resources"; and to manage pasture and hayland "to maintain enough cover to protect the soil." Although the agreement also had other intended effects, it is nonetheless a "soil conservation agreement" under the same provision. Finally, because the USDA shared the costs of these projects, the use of the land "met the requirements for payment or other compensation." There is simply no grounds in Section 7–36–20(B) for concluding, as the Board might have, that an agreement is not a bona fide soil conservation agreement even if its primary purpose is something other than soil conservation.

{37} Nonetheless, establishing that the Lodge entered into a valid soil conservation agreement only satisfies the "agricultural use" requirement of Section 7–36–20(B). Under Subsection A of that Section, this use must also be the "primary" use of the property. That is, under Sections 7–36–20(A) and (B), the primary use of the land must be to meet the requirements for compensation pursuant to the soil conservation agreement in order to be entitled to the agricultural method of valuation. Conversely, property which is primarily used for non-agricultural purposes but which incidentally meets the requirements for compensation pursuant to a valid soil conservation agreement is not "land used primarily for agricultural purposes" under Section 7–36–20(A). Considering that the agricultural method of valuation is meant to be a limited exception to the normal rule of property taxation, *cf. Ambell*, 94 N.M. at 397, 611 P.2d at 220 (noting that "Section 7–36–20 establishes a *special* method of valuation"), we doubt the Legislature intended a broad safe harbor for those whose primary use of the land is non-agricultural but who also enter into a soil conservation agreement. This may be what the Board was alluding to in its order when it concluded that the Lodge's soil conservation agreement did not satisfy Section 7–36–20 because the primary purpose of the uses described in the agreement was to provide suitable habitat for elk, not to conserve soil. *Cf. Rio Grande Chapter of the Sierra Club*, 2003–NMSC–005, ¶ 13, 133 N.M. 97, 61 P.3d 806 (noting that "a court may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned") (quotation marks and quoted authority omitted).

{38} The Court of Appeals, interpreting 3.6.5.27(A)(1) NMAC, concluded that "the Nation's qualification for compensation under this agreement constituted primary agricultural use of the upland portion of the property" without a further showing that the compensation agreement was the primary use of the property. *Jicarilla Apache Nation*, 2004–NMCA–055, ¶ 41, 135 N.M. 630, 92 P.3d 642. We disagree. That regulation provides:

   (1) When applying for classification of land as land used primarily for agricultural

purposes, the owner of the land bears the burden of demonstrating that the use of the land is primarily agricultural. *This burden cannot be met without submitting objective evidence that:*

   (a) the plants, crops, trees, forest products, orchard crops, livestock, poultry or fish which were produced or which were attempted to be produced through use of the land were:

      (i) produced for sale or home consumption in whole or in part; or

      (ii) used by others for sale or resale; or

      (iii) used, as feed, seed or breeding stock, to produce other such products which other products were to be held for sale or home consumption; or

   (b) the use of the land met the requirements for payment or other compensation pursuant to a soil conservation program under an agreement with an agency of the federal government; or

   (c) the owner of the land was resting the land to maintain its capacity to produce such products in subsequent years.

3.6.5.27(A) NMAC (emphasis added).

{39} The regulation delineates several ways that a taxpayer can demonstrate that the land is used for agricultural purposes. The listed uses are alternative necessary conditions for establishing agricultural use, and the regulation requires the taxpayer to present objective evidence that the land is used in accordance with at least one of them. None, however, are sufficient conditions that by themselves definitively prove that the land meets all of the qualifications for the agricultural exemption. The taxpayer must still establish the other two requirements found in Section 7–36–20(A): that the agricultural use is bona fide and the primary use of the land. In this case, objective evidence that the "land meets the requirements for payment or other compensation pursuant to a soil conservation program under an agreement with an agency of the federal government" was a necessary element to prove

agricultural use, but it was not sufficient by itself to establish the agricultural exemption. The Lodge also needed to prove that this use was the primary use of the land. The Court of Appeals seems to have read the minimum requirement of proving the existence of the soil conservation agreement as one sufficient to establish, by itself, that the use consistent with the agreement is a primary use. *Jicarilla Apache Nation*, 2004–NMCA–055, ¶¶ 39–40, 135 N.M. 630, 92 P.3d 642.

{40} The regulation, however, does not read: "This burden *will be met by* submitting objective evidence" of use consistent with a valid soil conservation agreement. Instead, it reads: "This burden *cannot be met without* submitting objective evidence" of the proper use. In that sense, subsection (A)(1)(b), unlike subsection (A)(1)(a), adds very little to the requirements set forth in Section 7–36–20(A) and (B) that the property be primarily used to meet the requirements of a valid soil conservation agreement. Furthermore, a reading of 3.6.5.27(A)(1) NMAC that obviates the need to show that the property is primarily used to meet the requirements for compensation under a valid soil conservation agreement would conflict with Section 7–36–20(A), and would be *ultra vires*. *See City of Albuquerque v. Pub. Regulatory Comm'n*, 2003–NMSC–028, ¶ 22, 134 N.M. 472, 79 P.3d 297.

{41} Consistent with the Court of Appeals, we hold that the Lodge entered into a valid soil conservation agreement with the USDA which governs in part the use of the uplands region. Contrary to the Court of Appeals, however, we uphold the Board's determination that the agreement was insufficient to establish that the primary use of the uplands region was agricultural. The Board's conclusion that the primary use of the land was commercial hunting, not to meet the requirements of the agreement, is supported by substantial evidence and is not contrary to law. We therefore reverse the Court of Appeals on this point and affirm the order of the Board.

### III.   Conclusion

{42} For the foregoing reasons, we reverse the Court of Appeals and affirm the decision

and order of the Board. We remand this case for proceedings consistent with this opinion.

{43} ***IT IS SO ORDERED.***

WE CONCUR: PETRA JIMENEZ MAES, Chief Justice, PATRICIO M. SERNA, Justice.

PAMELA B. MINZNER, Justice (dissenting).

RODERICK T. KENNEDY, Judge (sitting by designation) (dissenting).

MINZNER, Justice (dissenting).

{44} I respectfully dissent. The statutory analysis on which the opinion depends seems to me to give too little weight to the text of NMSA 1978, Section 7–36–20 (1997) and too much weight to *Alexander v. Anderson*, 1999–NMCA–021, 126 N.M. 632, 973 P.2d 884, in which the Court of Appeals construed and applied Section 7–36–20(A) as it read prior to the 1997 amendment. I would affirm the opinion of the Court of Appeals on the following basis.

{45} The prior statute read as follows:

A. The value of land used primarily for agricultural purposes shall be determined on the basis of the land's capacity to produce agricultural products. The burden of demonstrating primary agricultural use is on the owner of the land, and he must produce objective evidence of bona fide agricultural use for the year preceding the year in which application is made for his land to be valued under this section. The fact that land was devoted to agricultural use in the preceding year is not of itself sufficient evidence to support a finding of bona fide primary agricultural use when there is evidence that the agricultural use was subordinate to another use or purpose of the owner, such as holding for speculative land subdivision and sale, commercial use of a nonagricultural character, recreational use or other nonagricultural purpose.

1975 N.M. Laws, ch. 165, § 3.

{46} The existing statute reads as follows:

A. The value of land used primarily for agricultural purposes shall be determined on the basis of the land's capacity to produce agricultural products. Evidence of bona fide primary agricultural use of land for the tax year preceding the year for which determination is made of eligibility for the land to be valued under this section creates a presumption that the land is used primarily for agricultural purposes during the tax year in which the determination is made. If the land was valued under this section in one or more of the three tax years preceding the year in which the determination is made and the use of the land has not changed since the most recent valuation under this section, a presumption is created that the land continues to be entitled to that valuation.

§ 7–36–20(A).

{47} The prior statute contained neither of the two presumptions the present statute contains. The prior statute placed the burden of demonstrating "primary agricultural use" on the owner wishing to take advantage of Section 7–36–20(A) and required "objective evidence of bona fide agricultural use for the year preceding the year in which application is made." The existing statute first creates a presumption "that the land is used primarily for agricultural purposes during the tax year in which the determination is made" if there is "[e]vidence of bona fide primary agricultural use of land for the tax year preceding the year for which determination is made." The existing statute creates a second presumption; the existing statute creates a presumption "that the land continues to be entitled" to valuation under Section 7–36–20(A) "[i]f the land was valued under this section in one or more of the three tax years preceding the year in which the determination is made."

{48} These differences between the two statutes suggest that the Legislature was trying to simplify proof for the taxpayer and give greater weight to a prior determination of agricultural use. Further, the rules of construction the Legislature have provided, *see generally* NMSA 1978, § 12–2A–10(A) (1997), indicate that to the extent there is a conflict between or among statutes, the later, as well as the more specific, controls.

{49} I recognize that Section 12–2A–10(A) provides that "[i]f statutes appear to conflict, they must be construed, if possible, to give effect to each." As the majority indicates, the Board attempted to construe Section 7–36–20(A) and NMSA 1978, Section 7–38–6 (1981) to give effect to both by placing the initial burden of persuasion on the Assessor and then, after determining that the Assessor had produced sufficient evidence to rebut the presumption provided by Section 7–36–20(A), affording the Assessor's determination the presumption provided by Section 7–38–6. *See* Maj. Op. ¶ 12. I agree with the majority that the 1981 amendment to Section 7–38–6 calls into question the analysis of that section contained in *Black v. Bernalillo County Valuation Protests Bd.*, 95 N.M. 136, 141, 619 P.2d 581, 586 (Ct.App.1980). In *Black*, the Court of Appeals reasoned that because Section 7–38–6 referred to "[v]alues" as presumptively correct and the facts presented raised an issue of entitlement "to the special method of valuation provided for in § 7–36–20," the presumption provided for in Section 7–38–6 did not apply. 95 N.M. at 140–41, 619 P.2d at 585–86. In 1981, the Legislature added the term "classification" to the list of "determinations" that were presumed correct. The amendment raises a question of construction: whether, by adding the term "classification" to the list of determinations of value that are presumed correct, the Legislature intended to change the result in *Black*.

{50} The facts that *Black* was decided in 1980 and the amendment was enacted in 1981 seem to me to raise the question, rather than answer it. The majority reasons that the amended statute indicates an intent to overrule *Black*. I am not certain that the analysis in *Black* depended on the list of determinations the Legislature had provided prior to 1981, rather than the difference between the purposes of Section 7–38–6 and Section 7–36–20(A). I understand *Black* to have reasoned that Section 7–36–20(A) was a more specific statute, one which provided a method of valuation to which a taxpayer was entitled if the statutory requirements were met. The 1981 amendment to Section 7–38–6 makes the

Legislature's intent less clear, but the 1997 amendment to Section 7–36–20(A) seems to me to be more consistent with the continued validity of *Black* than with a construction of its having been overruled.

{51} If there is ambiguity, and I am not persuaded there is, the more general rule of construction I would apply favors the taxpayer. "Where there is reasonable doubt of the meaning of a revenue statute, the doubt is resolved in favor of those taxed." 3A Norman J. Singer, *Statutes and Statutory Construction* § 66:1, at 3 (6th ed.2003). Professor Singer notes that there are several theories that have been advanced in support of the principle, including that the principle is "a desirable way to secure equality and uniformity in the imposition of the tax burden." *Id.* at 13. As the majority notes, the Court of Appeals accepted certification in part to secure a "uniform application of the Property Tax Code." *See* Maj. Op. ¶ 27 n. 1. I believe trying to use the presumption provided in Section 7–38–6 as well as the presumption provided in Section 7–36–20(A) probably will result in less uniformity, because there will be two evidentiary determinations. The first determination will be whether the Assessor has rebutted the taxpayer's showing; the second will be whether the taxpayer has rebutted the Assessor's showing. I have difficulty believing the Legislature contemplated such a process when it amended Section 7–36–20(A). The Legislature easily could have included a cross-reference to Section 7–38–6 within Section 7–36–20(A), and the fact that it did not makes me think the two sections should be construed independently, as the Court of Appeals did in *Black.*

{52} Section 7–36–20(C) takes on added meaning following the 1997 amendment to Section 7–36–20(A). Section 7–36–20(C) provides now, as it did when the prior version of Section 7–36–20(A) was in effect, that "[t]he department shall adopt regulations for determining whether or not land is used primarily for agricultural purposes." It may have been intended to clarify, under the prior version of the statute, what a taxpayer claiming "the special method of valuation provided for in [Section] 7–36–20," *Black,* 95 N.M. at 141, 619 P.2d at 586, needs to show to satisfy the burden of production imposed by the prior version of Section 7–36–20(A). Nevertheless, if the regulations are, as I believe they are, the significant source of guidance in determining when "land is used primarily for agricultural purposes," then I also believe the majority gives too little weight to the regulation apparently adopted in response to Section 7–36–20(A).

{53} In response to Section 7–36–20(C), as the majority notes in paragraph 38, the Department has provided that the taxpayer cannot meet the burden of demonstrating that the use of land is primarily agricultural "without submitting objective evidence that . . . the use of the land met the requirements for payment or other compensation pursuant to a soil conservation program under an agreement with an agency of the federal government." Special Method of Valuation—Land Used Primarily for Agricultural Purposes, 3.6.5.27(A)(1)(b) NMAC (4/30/2001). The majority reasons that the listed use is a necessary, but not a sufficient, showing that the taxpayer is entitled to the benefits of Section 7–36–20. Maj. Op. ¶ 39. The Court of Appeals reasoned that having shown a valid Soil Conservation Agreement, the taxpayer had made a showing the Assessor failed to rebut. I agree.

{54} The existence of a valid Soil Conservation Agreement stands alone as justifying a classification of land as agricultural under the statute. The taxpayer was entitled to the benefit of the presumption provided in Section 7–36–20(A). The Assessor was required to rebut that presumption. The Assessor offered evidence to support a finding of fact or conclusion that land covered by the agreement was used to create a habitat for elk. The regulation does not limit the availability of agricultural classification to particular uses under an agreement, but rather refers only to "the requirements for payment or other compensation pursuant to a soil conservation program under an agreement with an agency of the federal government." 3.6.5.27(A)(1)(b) NMAC. That language exactly tracks the language of Section 7–36–20(B). The majority appropriately emphasizes that the statute indicates the Legisla-

ture intended the special method of valuation for land used "primarily for agricultural purposes." *See* Maj. Op. ¶ 37. I disagree that the Board was entitled to conclude "that the Lodge's [S]oil [C]onservation [A]greement did not satisfy Section 7–36–20 because the primary purpose of the uses described in the agreement was to provide suitable habitat for elk, not to conserve soil." *See* Maj. Op. ¶ 37.

{55} After the 1997 amendment to Section 7–36–20(A), the Legislature seems to have entrusted to the Department the responsibility for providing guidance on "determining whether or not land is used primarily for agricultural purposes." § 7–36–20(C). After the 1997 amendment, Section 7–36–20(A) no longer provides much guidance on how a taxpayer initially shows land is used primarily for agricultural purposes. Section 7–36–20(C) continues to provide, however, that the Department is to issue appropriate regulations. The regulation the Department has provided does not require more of the taxpayer than did the Legislature in enacting Section 7–36–20(B). To add, as did the Board, the requirement that the taxpayer must demonstrate the use was to conserve soil or the limitation that providing a suitable habitat for elk is not agricultural seems to rewrite both the statute and the regulation. Adding or limiting the availability of the special method seems to me to be the work of the Legislature or the Department.

{56} One of the purposes of strict construction of a tax statute is to provide notice. "[A] rigid application of revenue measures is for the protection of citizens by informing them in unambiguous terms as to the amount and nature of their duty to pay taxes." 3A Singer, *supra* § 66.1, at 13. In suggesting that the Legislature could not have meant to grant land subject to a valid Soil Conservation Agreement the benefit of Section 7–36–20(A) if the use was non-agricultural, *see* Maj. Op. ¶ 37, the majority seems to me to overlook the fact that the Legislature has defined use pursuant to a Soil Conservation Agreement as agricultural. *See* § 7–36–20(B). Further, the majority has left open to a variety of interpretations a term the Legislature has entrusted the Department to in-

terpret by regulation. *See* Section 7–36–20(C).

{57} Because the Soil Conservation Agreement covers most of the acreage in dispute, the Board may have erred in addressing separately the acreage occupied by the private herd. *Cf.* 3.6.5.8(B) NMAC (governing classification of multiple-use properties, those which contain both residential and non-residential components) ("If it is not feasible to separate a multiple-use property into discreet entities, then that property shall be classified according to the predominant use of the property"). The private herd seems to occupy only about six thousand of the twenty-seven thousand acres at issue. Perhaps the predominant use of the property should be measured by the number of acres devoted to a use. The Board's determination that the predominant use of the land was to provide a suitable habitat for elk seems to have been a determination that affected its determination as to all twenty-seven thousand acres. I question whether the appeal actually presents two different questions. The assessment made, however, as well as the stipulations seem to have distinguished the acreage devoted to the public herd from the acreage devoted to the private herd.

{58} If it is necessary to address separately the acreage devoted to the private herd, then I believe the focus on whether elk are appropriately considered livestock or not is misplaced. The Board concluded that providing a habitat for elk was a non-agricultural use and that there was evidence the owner intended to make "recreational and other non-agricultural uses" primary. The Board relied on *Alexander* in concluding that an applicant was required to demonstrate an objective intent. The Board's analysis seems more consistent with the prior version of Section 7–36–20(A), which described evidence of use in a prior year as being insufficient "objective evidence" when "there is evidence that the agricultural use was subordinate to another use or purpose of the owner, such as . . . recreational use or other nonagricultural purpose." *See Alexander*, 1999–NMCA–021, ¶ 9, 126 N.M. 632, 973 P.2d 884. The Board's reliance on *Alexander* and the analysis therefore seem erroneous as a matter of law.

{59} The Board also relied on the evidence of income, the Bureau of Indian Affairs Letter Statement of Intent, and the fact that "[a] significant portion of the subject property is used for the production of private elk, and the grazing of public elk, both of which are used in the big game hunting business." The Board noted that timber income, which is recognized as a bona fide agricultural use, "averaged between 10% and 30% of the total income for the property for the four years given." The Board appears to have concluded that timber production was a secondary use. Having concluded that providing a suitable habitat for elk was a non-agricultural use, I think the Board must have thought the Legislature did not, or perhaps could not, have intended to encompass such use under Section 7–36–20. That is a thoughtful construction of the statutes, but not, I think, what we should conclude the Legislature intended after the 1997 amendment to Section 7–36–20(A).

{60} Based on the evidence produced, the most appropriate result seems to turn on who had the burden of proof on any question or questions of fact and then what law controls the conclusion to be drawn. If I am right to think that the taxpayer was entitled to rely on the presumption provided in the last sentence of Section 7–36–20(A), then the question is whether or not the Assessor provided enough to rebut that presumption. The Court of Appeals did not think that the absence of the term "elk" in P.T.D. 99–25 was enough, and I think that the recitation of other statutes both in the Court of Appeals opinion and the Majority Opinion is an indication of ambiguity within and among the statutes as a whole, rather than proof that the absence of the term within the division's order is an indication of direction from the Department. I am not convinced the ultimate question is factual. Even if all the questions were factual, however, the indica of domestication to which the majority refers in paragraph 28, when taken together with the statutory presumption provided by the third sentence in the present Section 7–36–20(A), seem circumstances that compel a different result.

{61} The majority affirms the Board in part on the basis of the Department's regulation creating a presumption "that land is not used primarily for agricultural purposes if income from nonagricultural use of the land exceeds the income from agricultural use of the land." Maj. Op. ¶¶ 17, 19 (quoting & discussing 3.6.5.27(A)(2) NMAC). The Court of Appeals reasoned that this presumption was not relevant because the Board did not rely on it. The majority believes the Board did rely on it, see Maj. Op. ¶ 19, but indicates agreement with the Court of Appeals that "when the parties dispute whether a given use is agricultural, this analysis is of limited utility." See Maj. Op. ¶ 20. I agree that the regulation does not resolve the issue presented on appeal.

{62} The Legislature probably ought to say something more about multiple uses, or pursuant to Section 7–36–20(C), the Department ought to say something more definitive about proof of primary use in light of Sections 7–36–20(A) and (C). Separating classification of land from a taxation scheme based on its generation of revenue as a measure of value might also be worthy of consideration. Until one or the other acts more definitively, I would conclude we ought to affirm the Court of Appeals.

{63} The issue of uniformity is an important one, and I appreciate that the majority tries to reach a decision that promotes uniformity. I think the Court of Appeals tried to do the same thing. What seems to me to be a deciding factor is that the Board appears to have had to reach a conclusion that the Legislature must make, whether or not providing habitat for elk is a non-agricultural use, because unless it is not, the taxpayer seems to be entitled to rely on the presumption the Legislature has provided. The Court of Appeals tried to work with the statutes as written, however ambiguous they seemed. The Board on the other hand, particularly with respect to the Soil Conservation Agreement, appears to have had to limit the statute the Legislature has written in order to reach its determinations. On balance, I believe the Court of Appeals opinion contains the more appropriate analysis.

{64} The majority would reverse the Court of Appeals on the basis the Board reached the right result. For the foregoing reasons, I respectfully dissent.

I CONCUR: RODERICK T. KENNEDY, Judge.