2005-NMCA-051

113 P.3d 347

**SANTA FE CUSTOM SHUTTERS & DOORS, INC., Plaintiff–Appellee/Cross–Appellant,**

v.

**HOME DEPOT U.S.A., INC., Defendant–Appellant/Cross–Appellee,**

and

**Santa Fe Custom Shutters & Doors, Inc., Plaintiff–Appellee,**

v.

**Home Depot, Inc., a Georgia corporation, Defendant–Appellant.**

Nos. 24,203, 23,825.

Court of Appeals of New Mexico.

March 4, 2005.

Certiorari Denied, No. 29,125, May 1, 2005.

As Corrected May 24, 2005.

Larry D. Maldegen, William P. Templeman, Stephen J. Lauer, Sharon W. Horndeski, Comeau, Maldegen, Templeman & Indall, LLP, Santa Fe, NM, for Plaintiff–Appellee/Cross–Appellant.

Alice T. Lorenz, Miller, Stratvert P.A., Albuquerque, NM, Andrew S. Montgomery, Montgomery & Andrews, P.A., Santa Fe, NM, for Defendant–Appellant/Cross–Appellee.

## OPINION

ALARID, Judge.

### INTRODUCTION

{1} Defendant–Appellant, Home Depot U.S.A., Inc. (Home Depot), is a foreign corporation with headquarters in Atlanta, Georgia. Plaintiff–Appellee, Santa Fe Custom Shutters and Doors, Inc. (SFCS), is a New Mexico corporation.

{2} In 1995, Julie Lubke and Martin Doobrovo began manufacturing custom shutters in Santa Fe, New Mexico. Subsequently Lubke and Doobrovo incorporated their business as SFCS. In addition to manufacturing shutters, SFCS would also deliver and install its products. In late 1995 and early 1997, SFCS entered into written "Installer Agreements" with Home Depot by which SFCS was to provide custom shutters and installation services to customers of Home Depot at its stores in Albuquerque, New Mexico.

{3} Starting in 1997, Paul Wyman, Home Depot's Divisional Install Manager for Home Depot's Southwest Division, encouraged SFCS to expand its production capacity. Wyman represented to SFCS that Home Depot would buy display samples from SFCS and place them in Home Depot stores in the Dallas/Fort Worth market. Wyman represented to SFCS that Home Depot would professionally market SFCS's products. Wyman represented to SFCS that if SFCS expanded and maintained its production capacity, he anticipated that Home Depot would forward large numbers of shutter orders to SFCS. Wyman further represented to SFCS that eventually Home Depot would market SFCS products nationwide.

{4} SFCS and Home Depot entered into an oral agreement by which SFCS would increase and maintain its production capacity and produce shutters for sale in Home Depot's stores in the Dallas/Fort Worth market. Home Depot agreed to place display samples in its stores in the Dallas/Fort Worth market and to professionally market SFCS's products to Home Depot's customers. SFCS and Home Depot did not discuss or agree on the duration of the agreement, nor did they discuss or agree upon terms governing the termination of the agreement. In mid–1998, Home Depot began to offer and display SFCS's products in some of its Dallas/Fort Worth stores.

{5} Relying on Wyman's representations, SFCS expanded its production capacity. SFCS moved into a larger facility, acquired more efficient equipment, and hired additional employees. SFCS obtained bank financing and borrowed from Lubke's and Doobrovo's retirement plans in order to finance the expansion. SFCS continued to expand its production capacity during 1999. By the end of 1999 SFCS had an annual production capacity of $1 million in gross sales. However, Home Depot did not aggressively market SFCS's products and services in its Dal-

las/Fort Worth stores. In 1999, SFCS sold approximately $200,000 worth of products and services through Home Depot.

{6} The relationship between SFCS and Home Depot soured. SFCS asserted that Home Depot had not lived up to its commitment to market SFCS's products and services to its customers in the Dallas/Fort Worth market. In February 2000, SFCS and Home Depot agreed to mutual commitments to improve the program and increase sales of SFCS's products and services in the Dallas/Fort Worth market. Nevertheless, on March 20, 2000, Home Depot abruptly terminated SFCS's business relationship with Home Depot stores in the Dallas/Fort Worth market. On July 17, 2000, Home Depot terminated all business relationships with SFCS.

{7} SFCS sued Home Depot. The district court conducted an eight-day bench trial. The district court determined that Home Depot was liable under four alternative theories: (1) breach of contract, (2) common-law fraud, (3) violation of the New Mexico Unfair Practices Act (UPA) [1], and (4) violation of the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA).[2] The district court awarded SFCS $3,770,039 in compensatory damages under each theory. The district court trebled the compensatory damages awarded on the UPA and DTPA claims for an award under each statute of $11,310,117. The district court awarded $1,000,000 in punitive damages on the breach of contract claim and $1,000,000 in punitive damages on the fraud claim. Lastly, the district court awarded post-judgment interest. The district court entered a judgment awarding SFCS treble damages of $11,310,117 and post-judgment interest in the amount of $688,936, for a total award of $11,999,053.

{8} Subsequently, in a Supplemental Judgment, the district court awarded SFCS $3,045,338.58 in attorney fees and costs.

{9} Both parties appeal.

### The Texas DTPA

{10} Home Depot argues that the district court erred in not dismissing SFCS's DTPA claim. We agree.

{11} Under the DTPA, only consumers have standing to bring a claim. *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 706 (Tex.1983). To qualify as a consumer, the *plaintiff* must have sought or acquired goods or services by purchase or lease, and the goods or services so acquired must form the basis of the DTPA claim. *See Maginn v. Norwest Mortgage, Inc.*, 919 S.W.2d 164, 166 (Tex.App.1996). SFCS does not claim that it acquired goods from Home Depot. SFCS argues that it has standing as a consumer under the DTPA because it acquired "marketing services" from Home Depot. Where, as here, the operative facts are not in dispute,[3] whether a plaintiff was a consumer in relation to a transaction is a question of law. *FDIC v. Munn*, 804 F.2d 860, 863 (5th Cir.1986) (applying DTPA); *cf. N.M. Dep't of Labor v. A.C. Elec., Inc.*, 1998–NMCA–141, ¶ 8, 125 N.M. 779, 965 P.2d 363 (construing NMSA 1978, § 50–4–22 (1999)); *Jicarilla Apache Nation v. Rodarte*, 2004–NMSC–035, ¶ 24, 136 N.M. 630, 103 P.3d 554.

{12} In applying the DTPA, Texas courts distinguish between services that are the "objective" of a transaction and services that are merely "incidental." *Maginn*, 919 S.W.2d at 166. Services that are not the "end and aim" of the transaction and that serve no purpose other than facilitating the objective of the transaction are incidental as a matter of law. *Id.* at 167. A plaintiff's

---

1. NMSA 1978, §§ 57–12–1 to –22 (1967, as amended through 2003).

2. Tex. Bus & Com.Code Ann. §§ 17.41 to 17.63 (West 2002).

3. There is no dispute that Home Depot agreed to place displays of SFCS's products in its stores in the Dallas/Fort Worth market and to train its sales staff so that they would be able to assist Home Depot's customers in ordering shutters. The district court found that Home Depot's marketing expertise was a "central" factor in SFCS's decision to expand into the Dallas/Fort Worth market. The district court found that "[SFCS] agreed to ... produce shutters for sale through Home Depot's stores at mutually agreed-upon prices."

receipt of some incidental benefit from services performed by the defendant does not confer consumer status on the plaintiff if the plaintiff's objective in entering into the transaction is not the acquisition of goods or services. *See id.* Applying Texas law interpreting the DTPA, we hold as a matter of law that "the end and aim" of SFCS's contract with Home Depot was the receipt of payment of the purchase price of its goods and services. Marketing efforts by Home Depot directed at its own customers were incidental to SFCS's ultimate objective of obtaining payment for goods and services sold to Home Depot. "Money is not 'goods' under the DTPA, and acts to acquire money are not attempts to acquire services as defined by the DTPA." *Canfield v. Bank One, Tex., N.A.,* 51 S.W.3d 828, 839 (Tex.App. 2001). SFCS's attempt to characterize itself as a consumer is a variant of the discredited argument that because "all transactions involve human service to some extent, the cost of which is included in the price of the transaction ... all 'services' in any transaction are purchased services under the DTPA." *Munn,* 804 F.2d at 863–64 (rejecting the argument that the provision of any services in a transaction otherwise excluded from the DTPA will give rise to consumer status). Under Texas law, SFCS's relationship to the SFCS–Home Depot transaction was as a seller of goods and services whose objective was payment in money for those goods and services. As a seller, SFCS lacks standing under the DTPA.

**New Mexico UPA**

{13} Home Depot argues that SFCS lacks standing to bring a claim under the UPA. We agree.

■ {14} The Unfair Practices Act defines an "unfair or deceptive trade practice" as

any false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale ... of goods or services ... by any person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person.

Section 57–12–2(D). As we read this provision, the UPA contemplates a plaintiff who seeks or acquires goods or services and a defendant who provides goods or services. In an effort to establish UPA standing as a purchaser of services, SFCS argues that we should treat Home Depot's activities in marketing SFCS's shutters to Home Depot's own customers as marketing services purchased by SFCS. We did not find this argument persuasive in the context of the DTPA and we do not find it persuasive in the context of the UPA.

■ {15} Whether Home Depot's activities in marketing SFCS's products and services to Home Depot's customers constituted a sale of services within the meaning of Section 57–12–2(D) involves both a question of statutory construction and the application of the statute as construed to the specific facts of this case. *See A.C. Elec., Inc.,* 1998–NMCA–141,¶ 8, 125 N.M. 779, 965 P.2d 363. Here, the historical facts are not in dispute; accordingly, we are faced with a pure question of law, subject to de novo review. *Jicarilla Apache Nation,* 2004–NMSC–035, ¶ 24, 136 N.M. 630, 103 P.3d 554. Although the district court purported to find that the transaction between Home Depot and SFCS involved the exchange, sale, or distribution of Home Depot's marketing services, we are not bound by the district court's characterization of an issue of law as a finding of fact. *See Latta v. Harvey,* 67 N.M. 72, 76, 352 P.2d 649, 651 (1960) (observing that it is improper for a trial court to make findings as to legal conclusions).

{16} The district court found that SFCS agreed to "produce shutters for sale through Home Depot's stores at mutually agreed-upon prices." This finding is consistent with the common understanding that Home Depot's role in the transaction with SFCS would have been as a buyer of goods or services, while SFCS's role was that of a seller. *See* NMSA 1978, § 55–2–103(1)(a), (d) (1993).

■ {17} If the legislature had defined an unfair or deceptive trade practice in terms of misrepresentations made in connection with the sale *or purchase* of goods or services, we might be inclined to recognize a claim against

Home Depot as a buyer of goods and services. However, the legislature has not chosen to treat sellers and buyers identically under the UPA. Consistent with its purpose as consumer protection legislation, *Ashlock v. Sunwest Bank*, 107 N.M. 100, 102, 753 P.2d 346, 348 (1988); *overruled on other grounds by Gonzales v. Surgidev Corp.*, 120 N.M. 133, 899 P.2d 576 (1995), the UPA gives standing only to buyers of goods or services. *See Channel Cos. v. Britton*, 167 N.J.Super. 417, 400 A.2d 1221 (1979) (construing New Jersey Consumer Fraud Act and observing that "[t]he legislative concern was the victimized consumer, not the occasionally victimized seller").

{18} It is not at all unusual for a sales contract to impose an executory duty on the purchaser to promote sales of the purchased goods or services. *See, e.g.*, NMSA 1978, § 55–2–306(2) (1961) (imposing a statutory duty on the buyer under an exclusive dealing contract to use best efforts to promote the sale of the seller's goods); *Custom Communications Eng'g, Inc. v. E.F. Johnson Co.*, 269 N.J.Super. 531, 636 A.2d 80, 83 (1993) (observing that a distributorship agreement expressly imposed a duty on the distributor to use best efforts to promote the sale of the manufacturer's products). We have not found any case treating the activities of a buyer of goods or services in promoting sales to its own customers of purchased goods or services as a separate sale of marketing services to the manufacturer or supplier of the goods or services. We hold that Home Depot's activities in marketing SFCS's shutters and installation services to Home Depot's own customers was not a sale of marketing services to SFCS for purposes of Section 57–12–2(D); with respect to the SFCS–Home Depot transactions, SFCS was a seller of goods and services, not a buyer. As a seller of goods and services, SFCS lacks standing to bring a UPA claim against Home Depot.

## Evidentiary Rulings

{19} Home Depot appeals two evidentiary rulings of the district court. We apply a de novo standard to the question of whether the district court utilized the correct evidentiary rule or standard. *State v. Torres*, 1999–NMSC–010, ¶ 28, 127 N.M. 20, 976 P.2d 20. We otherwise review the district court's rulings admitting or excluding evidence for an abuse of discretion. *Gonzales v. N.M. Dep't of Health*, 2000–NMSC–029, ¶ 24, 129 N.M. 586, 11 P.3d 550.

{20} The district court permitted SFCS to call Mark Berry, who testified in considerable detail as to the dealings between Home Depot and Snappy Sheds, a family-owned business engaged in the manufacture of portable metal storage sheds in Truth or Consequences, New Mexico. The district court overruled Home Depot's objection to this testimony, agreeing with SFCS's argument that it was admissible under Rule 11–404(B) NMRA to establish intent and motive. Home Depot argues that evidence of Snappy Sheds' experience with Home Depot was inadmissible under any theory and should have been excluded. SFCS responds that the Snappy Sheds' evidence was properly admitted pursuant to Rule 11–404(B) to establish that Home Depot acted with fraudulent intent and a culpable state of mind. As we explain below, the admission of evidence of Snappy Sheds' experience with Home Depot under Rule 11–404(B) was error.

{21} Berry testified that his family began manufacturing and selling the sheds in 1999 as a sideline to a construction and steel fabrication business. Initially, Berry and his family members focused on mobile home outlets, feed stores, and hardware stores as potential outlets for the sheds. Between start-up and May 2000, they sold approximately 150 sheds through their own marketing efforts. They phased out other aspects of their family business in order to concentrate on the sheds. In early 2000, Berry was contacted by a Lubbock, Texas businessman who previously had indicated his interest in becoming a Snappy Shed dealer. During this conversation, the potential dealer told Berry that he had been in contact with a "large hardware store chain," and that he was attempting to set up a meeting between Berry and representatives of the chain. A meeting and demonstration took place in Lubbock in April 2000. At the meeting, Berry was excited to

learn that the "large hardware store chain" was Home Depot.

{22} At the initial meeting, Home Depot was represented by Paul Wyman, Home Depot's Divisional Install Manager for the Southwest Division, and by Pat Kinney, a furnishing install manager for a district within the Southwest Division. Berry testified that he was "ecstatic" because "they're [Home Depot] the big boys, they're the No. 1." Berry came away from the meeting with the understanding that there was a "strong possibility" that Wyman would place the sheds in stores throughout the Southwest Division.

{23} A few weeks after the Lubbock meeting, Berry demonstrated the shed to a group of Home Depot store managers in Las Cruces, New Mexico. Kinney, Wyman, and store managers from Lubbock, Midland, Odessa, El Paso, and Las Cruces were present. The managers appeared enthusiastic about selling the sheds in their stores. Berry recalled that "[t]hey had basically the same reaction of, 'How soon can we get these in our stores?'" Wyman told Berry that he was "very excited about trying to get . . . our product into the Home Depot store, and he wanted to get them in right as soon as possible, right away."

{24} The next day, May 12, 2000, Kinney and Wyman met with Berry and his brother-in-law, Martin Gomez. During this meeting, Gomez executed an Installer Agreement on behalf of Snappy Sheds. Berry and Gomez gave Kinney and Wyman a tour of their manufacturing facility. Berry recalled Wyman stating that the possibility of selling such a high quality shed "gave him goosebumps, gave him chills" and that "he was excited to know us now at the ground floor, so he could tell people later when we got big that he knew us back when." Wyman and Berry discussed production capacity. Berry told Wyman that they were set up to produce roughly 240 sheds a month. Wyman told Berry that he should be "prepared to build up to that, beyond that, because once we branch out into other markets, get into all of his stores, our biggest problem would be being able to keep up with their sales." Wyman explained to Berry that "the two things

that would cost us our contract with Home Depot would be customer [dis]satisfaction or not being able to keep up with the sales from their stores." Wyman indicated that his concern was with Snappy Sheds' ability to provide product, not with Home Depot's ability to generate sales.

{25} Wyman described to Berry the efforts that Home Depot would make to promote sales of the sheds:

It was pretty well-discussed that, agreed upon, that Home Depot's job is to sell the items that they have in their stores. We were to sell at cost demo models to their stores. I repeat, at our cost. And they were—we were going to give them literature as far as selling. They were going to keep the literature in stock, keep the [demo models] clean, make them accessible to the public. If they had weekend events or any particular events, that they would help promote our buildings at that point and push them.

  . . . .

[W]e were to give them—give their stores PKs, which are product knowledge classes, and that their associates would push our buildings for us. Home Depot's office would help with advertising, get us in their catalogs.

{26} Snappy Sheds began "preparing, building up the demos, so when they gave us the word, like we were told, when they gave us the word it was going to be time to move. So we started leaping in that manner, building up manpower, a little more equipment, material, inventory, in stock buildings." By early July 2000, Berry had set up demonstration sheds at Home Depot stores in southern New Mexico and west Texas.

{27} Sales were "poor." Although Snappy Sheds had the capacity to produce 240 sheds per month, sales through Home Depot stores amounted to six or eight per month. Berry testified that he experienced "large problems as far as the [sheds] being covered up by other products that they sold; customers not being able to get to them; Home Depot associates storing items in them; Home Depot associates not knowing the product." When Snappy Sheds gave product knowledge

classes for sales associates, "very few associates would show, even after they had been scheduled for days and weeks in advance. Some would be cancelled, some would be postponed, some just not dealt with."

{28} Berry raised the possibility of moving Snappy Sheds into more Home Depot stores to increase sales. Snappy Sheds expanded into Home Depot stores in Albuquerque and Santa Fe. Berry also inquired into moving into the Dallas/Fort Worth market. Berry was told by Home Depot management to "[b]e prepared to be buried in sales" and to "just hang in there, Home Depot would get our sales up." In anticipation of moving into Home Depot stores in the Dallas/Fort Worth market Snappy Sheds acquired new vehicles and trailers, and Berry moved to Dallas. Snappy Sheds and its principals financed the new equipment by borrowing money. Snappy Sheds was "strapped" financially and its principals were "equally as stressed." Sales in Dallas were worse than the first few months in New Mexico. Berry attempted to persuade Home Depot management to allow Snappy Sheds to expand into additional stores in Dallas in order to increase sales. Snappy Sheds was given two more stores in Texas, one in Tyler and another in Longview. Sales did not improve. By April 2001, Snappy Sheds and its principals were in "[d]ire straits." Suppliers would not extend credit and some quit dealing with Snappy Sheds. Snappy Sheds' creditors began exercising security interests in its accounts receivables. Berry believed that the low sales were attributable to Home Depot's failure to push sales. In July 2001, Berry wrote Home Depot, explaining that Snappy Sheds was bankrupt and would no longer be supplying products to Home Depot. Berry summarized his family's experience with Home Depot:

> We were naive enough to, I guess, to trust them. They kept telling us, promising us that they would help us. They would get our sales up, do whatever that was necessary. Once it got a certain point, then we had no other options.

{29} Rule 11–404(B) provides that "[e]vidence of other ... acts is not admissible to prove the character of a person in order to show action in conformity therewith. *It may, however, be admissible for other purposes,* such as proof of ... intent ... or absence of mistake or accident." (Emphasis added.) For evidence to be properly admissible "for other purposes," such as establishing a party's state of mind, the evidence must bear on the issue in question "in a way that does not merely show propensity." *State v. Niewiadowski,* 120 N.M. 361, 363–64, 901 P.2d 779, 781–82 (Ct.App.1995). Although we agree with SFCS that the evidence of Snappy Sheds' experience with Home Depot tends to make it appear more likely that SFCS's roughly contemporaneous experience with Home Depot was intentional, rather than mistaken or accidental, this evidence is persuasive precisely because it tends to establish Home Depot's character for reneging on its promises to small, unsophisticated businesses. In closing argument, SFCS relied on Berry's testimony to argue that Home Depot has a bad corporate character:

> what happened to [Lubke] and [Doobrovo] is not some aberration. This is not a unique circumstance. We unfortunately during our discovery in Atlanta found a letter from Mr. Berry that's in evidence. And that letter jumped out at us because it was unbelievably similar to what these people had been told. And you heard Mr. Berry. These people made the same mistake that Mr. Berry testified to. They trusted Home Depot, and it led to the same result. The Berry family businesses were all bankrupted. Two of the three Berrys went through bankruptcy, and [Lubke] and [Doobrovo] lost Santa Fe Shutters. And, Your Honor, at some point this kind of business practice has to be stopped. Because how many more family businesses like these have to be destroyed?

We hold that evidence of Snappy Sheds' experience with Home Depot constituted improper evidence of "the character of a person in order to show action in conformity therewith." *State v. Ruiz,* 2001–NMCA–097, ¶ 18, 131 N.M. 241, 34 P.3d 630 (reversing the defendant's criminal conviction and observing that the use of evidence of other bad acts to show "that [the][d]efendant had a tendency to abuse children sexually, and if he abused

one girl, then he likely abused the others" is "exactly what Rule 11–404(B) does *not* allow"). The district court erred in admitting this evidence under Rule 11–404(B).

{30} SFCS argues that in any event the admission of this evidence was harmless. Quoting *Builders Steel Co. v. Commissioner of Internal Revenue,* 179 F.2d 377, 379 (8th Cir.1950), SFCS argues that "it is virtually impossible for a trial judge to commit reversible error by receiving incompetent evidence." We cannot agree.

{31} In a bench trial, a district court frequently must disregard evidence that has been offered by a party, but which the court has excluded. *See State v. Campos,* 1996–NMSC–043, ¶ 27, 122 N.M. 148, 921 P.2d 1266 (observing that in a bench trial the judge serves as both "gatekeeper" and factfinder). In such cases, we presume that the district court disregarded the incompetent evidence. *Gray v. Grayson,* 76 N.M. 255, 256, 414 P.2d 228, 229 (1966) (noting the general rule that the district court may be presumed to have disregarded incompetent evidence). This rule has obvious logical limits. When a district court in its role as gatekeeper *overrules* an objection and admits evidence, it is illogical to presume that the district court in its role as factfinder will disregard evidence that it already has concluded is admissible. This is particularly true when that evidence is highly persuasive. *People v. De Groot,* 108 Ill.App.2d 1, 247 N.E.2d 177, 181–82 (1969) (observing that "[w]here an objection has been made to the evidence and overruled, [sic] it cannot be presumed that the evidence did not enter into the court's consideration. The ruling itself indicates that the court thought the evidence proper"). We find SFCS's argument that the district court could not have used the evidence of Snappy Sheds' experiences for an improper purpose to be somewhat disingenuous considering that (1) in its closing argument SFCS pointedly invited the district court to infer from two suppliers' experiences that Home Depot was untrustworthy and had engaged in a business practice of deceit and broken promises; and (2) in its proposed findings of fact and conclusions of law, SFCS referred to Berry's testimony as evidentiary

support for findings that Home Depot's conduct was "malicious, reckless, wanton, oppressive and fraudulent" and that Home Depot made representations to SFCS "knowing that the representations were false and misleading." The district court adopted SFCS's requested finding that Home Depot's conduct was "malicious, reckless, wanton, oppressive and fraudulent" but added the additional phrase "and not as a result of mistake but was a regular practice of Home Depot." Berry's testimony was the only evidence that tended to establish that Home Depot engaged in a regular practice of wrongful conduct toward small suppliers as opposed to one-time wrongful behavior towards SFCS. On such a record, we will not presume that the district court disregarded the improper evidence. *See Moore v. Moore,* 28 N.M. 463, 467, 214 P. 585, 586–87 (1923) (stating the rule that the reviewing court may assume that incompetent evidence was relied upon by a trial court where it "was the only evidence on the subject, or was evidence, without which the court could not properly have reached the result announced").

{32} Error may not be predicated upon the erroneous admission of evidence "unless a substantial right of the [objecting] party is affected." Rule 11–103(A) NMRA. Where there is a "high probability" that the improper evidence may have influenced the factfinder, a "substantial right" of the objecting party has been affected. *City of Albuquerque v. PCA–Albuquerque # 19,* 115 N.M. 739, 744, 858 P.2d 406, 411 (Ct.App.1993). Here, Berry testified in considerable detail about Snappy Sheds' experience with Home Depot, and SFCS emphasized that testimony in its closing argument. We are satisfied that there is a high probability that the evidence of Snappy Sheds' financially disastrous experience as a Home Depot supplier-installer influenced the district court in finding that Home Depot "made representations to [SFCS], knowing that the representations were false and misleading," and that Home Depot's conduct toward SFCS was "malicious, reckless, wanton, oppressive and fraudulent and not as a result of mistake but [as] a regular practice of Home Depot." The district court's error in admitting this evidence

requires that we vacate the judgment on the fraud and contract counts, including the punitive damages awards. We vacate the judgment on the contract count, notwithstanding the general principle that contract liability is liability without fault, *Restatement (Second) of Contracts* 309, Introductory Note to Ch. 11 (1981), because the issue of Home Depot's state of mind was inextricably implicated in the district court's determination that Home Depot breached the implied covenant of good faith. The district court is directed to set aside the findings that Home Depot "made representations to [SFCS], knowing that the representations were false and misleading," and that Home Depot's conduct toward SFCS was "malicious, reckless, wanton, oppressive and fraudulent and not as a result of mistake but [as] a regular practice of Home Depot"; to reconsider the question of Home Depot's state of mind, disregarding the improper evidence relating to Snappy Sheds' experience with Home Depot; and to enter amended findings of fact and conclusions of law. *See Gray*, 76 N.M. at 257, 414 P.2d at 230.

{33} As a second evidentiary claim of error, Home Depot argues that the district court improperly limited Home Depot's introduction of testimony concerning the details of complaints about SFCS made by sales associates and customers, erroneously ruling that such evidence was hearsay.

{34} As we understand Home Depot's theory of admissibility, evidence of the details of these complaints was relevant to show Home Depot's state of mind—i.e., that Home Depot had good faith concerns about SFCS's willingness or ability to meet the expectations of customers and sales associates. Evidence establishing Home Depot's good faith concerns about SFCS's performance arguably would have tended to refute SFCS's claim that Home Depot acted with the culpable mental state required to support an award of punitive damages. *See Romero v. Mervyn's*, 109 N.M. 249, 255–56, 784 P.2d 992, 998–99 (1989) (distinguishing " 'wrongful' " breaches of contract sufficient to support an award of punitive damages from breaches "committed intentionally for legitimate business reasons or those that are the result of inadvertence").

{35} We agree with Home Depot that to the extent statements by out-of-court declarants were offered as circumstantial evidence of Home Depot's state of mind, this testimony was not hearsay. Hearsay is "an utterance by one person, which is offered only to evidence the state of mind which ensued in another person in consequence of the utterance, is admissible insofar as the hearsay rule is concerned." *Glass v. Stratoflex, Inc.*, 76 N.M. 595, 601, 417 P.2d 201, 204 (1966); *see also State v. Stampley*, 1999–NMSC–027, ¶ 39, 127 N.M. 426, 982 P.2d 477 (holding that out-of-court statements identifying the defendant as the perpetrator were not hearsay to the extent they were admitted to refute the defendant's claim that the investigating officer acted unreasonably and with an improper motive in focusing her investigation on the defendant).

{36} Because we are reversing and remanding on other grounds, the district court should use the opportunity presented by remand to revisit the issue of the admission of Home Depot's evidence of the details of specific complaints. At trial the district court generally precluded Home Depot's witnesses from testifying as to the specific details of complaints from customers and sales associates, ruling that such evidence was hearsay. The district court nevertheless allowed Home Depot's witnesses to testify about their own understanding of problems with SFCS, as long as they did not recount specific out-of-court statements by other persons. Within the parameters established by the district court, Home Depot introduced considerable testimony that customers, sales associates, and managers had problems with the quality of service provided by SFCS. Our opinion should not be understood to preclude the district court from considering other grounds for sustaining SFCS's objection to the admission of this evidence or to preclude the district court from exercising its discretion under Rule 11–403 NMRA; we merely hold that exclusion of this evidence solely on the hearsay grounds was improper.

### Benefit–of–the–Bargain Damages

{37} Home Depot argues that the district court erred by awarding SFCS benefit-of-

the-bargain damages based upon anticipated sales over a five-year period subsequent to Home Depot's termination of the agreement with SFCS. Because this issue will likely recur on remand, we address it even though we have vacated the judgment on other grounds.

▌ {38} Although the parties have relied on common-law authorities in briefing this case, it is immediately apparent that the contract between SFCS and Home Depot involved the mixed sale of goods (shutters) and services (installation), with the goods component clearly predominating.[4] *Plantation Shutter Co. v. Ezell,* 328 S.C. 475, 492 S.E.2d 404 (1997); *Kirkpatrick v. Introspect Healthcare Corp.,* 114 N.M. 706, 709–10, 845 P.2d 800, 803–04 (1992) (discussing "primary purpose" test). Additionally, our Supreme Court has held that a distributorship agreement—defined as "a contract for the sale of a product from a manufacturer at wholesale prices that is to be marketed in a specific area by the distributor"—is subject to Article 2 of the Uniform Commercial Code (UCC). *United Wholesale Liquor Co. v. Brown–Forman Distillers Corp.,* 108 N.M. 467, 775 P.2d 233 (1989). We hold that the agreement between SFCS and Home Depot is governed by Article 2 of the UCC. The facts that the contract imposed SFCS a duty to maintain sufficient capacity to meet Home Depot's needs and imposed on Home Depot a duty to market SFCS's goods and services to Home Depot's customers does not take the contract out of Article 2. *See* § 55–2–306(2) (requiring seller under exclusive requirements contract to use best efforts to supply goods and requiring buyer to use best efforts to promote sales of the product); *see also* 2A Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 2–306:54 (3d ed.1997 rev.) (summarizing the duties imposed by the UCC on a buyer of goods under a requirements contract).

▌ {39} As we demonstrate below, Article 2 expressly deals with the termination of a sales contract of indefinite duration. Where the legislature has spoken comprehensively and in detail on a subject, it is an indication that the legislature intends to displace the common law dealing with the same subject. *Rutherford v. Darwin,* 95 N.M. 340, 343, 622 P.2d 245, 248 (Ct.App.1980). We therefore apply the provisions of Article 2 governing termination of sales contracts of indefinite duration, rather common-law principles. *See id.* (holding that UCC law of restrictive endorsements is sufficiently comprehensive and detailed to exclude common-law exceptions which are not mentioned).

{40} The district court found that: (1) Home Depot and SFCS did not discuss or agree upon the duration of the contract, and (2) Home Depot and SFCS did not discuss or agree upon a reasonable time for notice of termination. Where, as here, the parties have not addressed termination of an agreement for an indefinite duration, Article 2 supplies the following default terms:

> (2) Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.

> (3) Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party.

NMSA 1978, § 55–2–309 (1961).

{41} According to a leading commentator:

> When a continuing contract does not contain any terms specifying the duration of the contract, it continues for a reasonable time but may be terminated at any time, *without regard to whether a reasonable time has already expired,* by one party upon the giving of reasonable notice.

Anderson, *supra* § 2–309:36 (emphasis added; footnotes omitted).

▌ {42} SFCS argues that notwithstanding the at-will nature of its business relationship with Home Depot, we should treat Home Depot's exercise of its right to terminate its relationship with SFCS as a breach of the duty of good faith. SFCS argues that unless we apply the duty of good

---

4.  SFCS's economics expert calculated SFCS's damages on the assumption that ten percent of the gross amount of a typical order was attributable to installation charges.

faith to limit Home Depot's right to terminate,

> [Home Depot] would be free to (a) entice, through misrepresentation, a company like [SFCS] to enter into a contractual relationship of indefinite duration requiring enormous up-front investments and debt, (b) promise a partnership likely to produce substantial profits, (c) fail to keep binding promises to professionally market the company's product, and (d) before the anticipated profits could be realized, terminate the arrangement in breach of any notion of good faith and fair dealing.

{43} We agree with SFCS that the implied duty of good faith, *see* § 55–1–203, applies in the context of a termination of a contract of indefinite duration. That does not mean, however, that the general duty of good faith overrides the right to terminate "at any time" specifically conferred by § 55–2–309(2).

> There can be no question that the broad terms of UCC § 1–203[recognizing an implied duty of good faith] mandate that the limitation of good faith apply to all actions taken under the authority of the Code. This, however, does not answer the question of what is meant by "good faith" in the context of a notice to terminate an indefinite duration contract. The very absence of any predicate that must be established as a condition precedent to terminating the contract emphasizes the absence of any significance to the good faith concept in this particular situation.

Anderson, *supra* § 2–309:49 (footnotes omitted). Other leading commentators agree: "We do not believe that ideas of good faith should be used to deprive a terminating party of the rights it would otherwise have under 2–309(2)." 1 James J. White & Robert S. Summers, *Uniform Commercial Code* 140 (4th ed.1995). We agree with Home Depot that "[t]he essence of the at-will doctrine is the right of either party to cease doing business without liability for *future* profits the other party hopes it will earn if the relationship continues." (Emphasis added.)

■ {44} The implied duty of good faith does not confer on a district court "a roving commission to do whatever its wishes in the name of fairness." *Cf. United Props. Ltd. v.*

*Walgreen Props., Inc.,* 2003–NMCA–140, ¶ 19, 134 N.M. 725, 82 P.3d 535 (discussing limitations on the authority of a district court exercising equity jurisdiction to relieve a party from the consequences of its failure to exercise an option in accordance with the terms of a lease). If SFCS desired the security of a contract binding Home Depot to a business relationship lasting a specific term of years, it was free to bargain for such a term. *See Melnick v. State Farm Mut. Auto. Ins. Co.,* 106 N.M. 726, 732, 749 P.2d 1105, 1111 (1988) (observing that "[p]arties to a contract may negotiate and bargain for provisions which are beneficial to them" and declining to apply common-law implied covenant of good faith and fair dealing to override express provision making insurance agency terminable at will). In the absence of such a term, Home Depot had the right to terminate its contractual relationship with SFCS "at any time," under Section 55–2–309(2), and this was so without regard to whether the contract had been in effect for a reasonable time when Home Depot terminated the contract. Anderson, *supra* at § 2–309:36. The district court concluded that SFCS was entitled to damages for lost profits calculated over a five-year period beginning January 1, 2000. In view of Home Depot's right to terminate its contracts with SFCS at any time, which there is no dispute Home Depot exercised on March 20, and July 17, 2000, the district court's use of the five-year period in calculating benefit-of-the-bargain damages was error.

■ {45} Our decision does not inexorably lead to the hyperbolically dire consequences predicted by SFCS for several reasons. First, we see no reason for precluding a party who has been fraudulently induced to enter into a contract from electing to recover costs incurred in preparing to perform the contract as an alternative to seeking damages for the loss of the benefit of the bargain. *See* E. Allan Farnsworth, *Contracts* § 12.16 (3d ed.1999) (discussing reliance interest as an alternative measure of damages for breach of contract); 1 Roy Ryden Anderson, *Damages under the Uniform Commercial Code* § 1:3 (2d. ed.2003) (observing that "the basic law of contract regarding restitution

and reliance is preserved for Code cases by Section 1–103"); *Restatement (Second) of Torts* § 549(1)(b) (1977) (recognizing that victim of fraud may recover pecuniary loss suffered as the result of reliance upon the misrepresentation). SFCS could have sought recovery of damages measured by its "enormous" up-front investment; instead, SFCS elected to pursue damages measured by the benefit of the bargain. Second, if the breaching party's representations in fact are binding promises, those promises may be enforced under established principles of contract law. Under our holding, SFCS is entitled to damages based upon profits that would have accrued if Home Depot had professionally marketed SFCS's products and services over the period *prior to* termination. SFCS may also be entitled to *post*-termination damages if the district court determines on remand that Home Depot failed to provide reasonable notification of its decision to terminate its business relations with SFCS and SFCS suffered damages due to the lack of reasonable notification. *RGJ Assoc., Inc. v. Stainsafe, Inc.,* 300 F.Supp.2d 250 (D.Mass.2004) (discussing measure of seller's damages for buyer's breach of the duty of reasonable notification in the context of an unwritten requirements contract; distinguishing damages caused by inadequate notice of termination from non-recoverable profits lost as a result of the termination of a contract of indefinite duration). Lastly, in cases of fraud or cases involving breach of contract accompanied by reckless disregard for the plaintiff's rights, the injured party may recover punitive damages. *E.g. Garcia v. Coffman,* 1997–NMCA–092, ¶¶ 34–36, 124 N.M. 12, 946 P.2d 216 (affirming award of punitive damages for fraud); *Paiz v. State Farm Fire & Cas. Co.,* 118 N.M. 203, 211, 880 P.2d 300, 308 (1994) (discussing standards for awarding punitive damages in breach of contract cases). Although we have vacated the award of punitive damages, our decision does not foreclose an award of punitive damages on remand.

**Issues Rendered Moot**

{46} Home Depot appeals from the district court's award of attorney fees. SFCS cross-appeals the amount of damages awarded un-

der the DTPA. Our determination that SFCS lacks standing under both the DTPA and UPA requires that we vacate the award of attorney fees. Our determination that SFCS lacks standing under the DTPA even to seek damages renders moot SFCS's cross-appeal as to the amount of damages.

**CONCLUSION**

{47} We reverse the judgment of the district court and remand for proceedings consistent with this opinion.

{48} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN and RODERICK T. KENNEDY, Judges.